UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AARON RUBENSTEIN,
                Plaintiff,

-v-

BRUCE R. BERKOWITZ, et al.,
                Defendants,

and

SEARS HOLDINGS CORP.,
                Nominal Defendant.

17-CV-821 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

    Federal law requires that certain corporate insiders disgorge short-swing profits—i.e., profits from the purchase and sale of company stock where both transactions occur within a single six-month period. Plaintiff Aaron Rubenstein, suing on behalf of Sears Corporation, claims that defendants Bruce Berkowitz and Fairholme Capital Management, L.L.C. were Sears insiders and made short-swing profits on Sears Stock. Berkowitz and Fairholme move to dismiss. For the reasons that follow, the motion is granted.

## I. Background

    The following facts are alleged in the Complaint and are presumed true for the purposes of this motion.

    Plaintiff Aaron Rubenstein owns Sears stock. Defendant Bruce Berkowitz is the founder and Chief Investment Officer of Defendant Fairholme Capital Management. (Compl. ¶¶ 6–8.) Sears is a nominal defendant in this action, so "Defendants" refers to Berkowitz and Fairholme only.

In September 2014, Defendants filed a Schedule 13D with the Securities and Exchange Commission ("SEC"). Schedule 13D filings are required whenever someone acquires beneficial ownership of more than 5% of a public company's stock. The 13D filing had three key pieces of information: (1) that Defendants were beneficial owners of about 24% of Sears stock; (2) that an unspecified part of the 24% was composed of stock owned by certain accounts managed by Fairholme (the "managed accounts"); and (3) that Defendants reserved the right to use their voting power to push for changes in the company, including actions having a "change of control" purpose. (Compl. ¶¶ 13–14.) The Complaint alleges that, by virtue of this alliance, all participants of the group—including Defendants and their managed-account clients—became corporate insiders owning more than 10 percent of Sears stock. (Compl. ¶¶ 15–19.) This made them subject to the short-swing-profit rule.

Once Defendants and their managed-account clients became subject to the short-swing-profit rule, they allegedly realized short-swing profits. (Compl. ¶ 20.) However, the Complaint does not specify exactly who entered into those transactions and for how much. It simply alleges in broad strokes (1) that Defendants made trades that netted short-swing profits, and (2) that Defendants' managed-account clients made trades that netted short-swing profits. (*See* Compl. ¶¶ 20, 28–29.)

The Complaint demands that Defendants (a) disgorge any short-swing profits that they themselves made, (b) disgorge any short-swing profits made by their managed-account clients, and (c) disgorge any pecuniary gain Defendants made from their clients' short-swing profits.

## II.     Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]

judge ruling on a defendant's motion to dismiss a complaint 'must accept as true all of the factual allegations contained in the complaint.'" *Twombly*, 550 U.S. at 572 (quoting *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002)). And while "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, courts must draw "all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Securities Litigation*, 503 F.3d 89, 95 (2d Cir. 2007).

## III. Discussion

### A. Statutory Framework

This case involves both a federal statute and an administrative rule. The statute, Section 16(b) of the Exchange Act, provides:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer . . . .

15 U.S.C. § 78p(b). Thus, the statute applies when there was "(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period." *Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

The short-swing-profit rule is one of strict liability. It "operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320–21 (2d Cir. 1998). As long as an insider buys-then-sells or sells-then-buys stock in the company, with both transactions occurring within six months of each other, the profits go to the company.

3

Section 16 does not define "beneficial owner," but instead leaves that task to the SEC. The SEC rule, somewhat confusingly, has two definitions of "beneficial owner." *See* 17 C.F.R. § 240.16a–1(a)(1)–(2). As the Second Circuit has explained:

> The first use is to determine who is a ten-percent beneficial owner and therefore a statutory insider. The second use is the determination of which transactions must be reported under Section 16(a) as effecting a change in beneficial ownership or as triggering liability under Section 16(b).

*Feder v. Frost*, 220 F.3d 29, 33 (2d Cir. 2000).

The SEC's first definition—which determines whether someone is a statutory insider—adopts the definition used in Section 13(d), which defines "beneficial owner" as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares [v]oting power . . . and/or [i]nvestment power." 17 C.F.R. § 240.13d–3(a); 17 C.F.R. § 240.16a–1(a)(1). Once a person is deemed a corporate insider, the second definition of beneficial owner comes into play for purposes of the short-swing-profit liability provisions of Section 16. It defines "beneficial owner" as "any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities. . . ." 17 C.F.R. § 240.16a–1(a)(2).

Thus, there are two questions to answer: (1) whether Defendants were "beneficial owners" of ten percent of Sears stock such that they were corporate insiders, and (2) whether Defendants were "beneficial owners" of the securities involved in the subsequent short-swing transactions such that they are liable under Section 16.

### B.     Beneficial Ownership of Ten Percent of Sears Stock

The threshold question is whether Defendants and their clients were beneficial owners of more than ten percent of Sears stock. If the answer is yes, it would make them Sears insiders.

4

Defendants do not contest that they met the definition of "[a] person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares [v]oting power . . . and/or [i]nvestment power." 17 C.F.R. § 240.13d–3(a). However, in a footnote, Defendants argue that they are subject to an exception for registered investment advisers, which, according to the SEC rule, "shall not be deemed the beneficial owner of securities . . . held for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business . . . as long as such shares are acquired . . . without the purpose or effect of changing or influencing control of the issuer . . . ." 17 C.F.R. §§ 240.16a–1(a)(1); (a)(1)(v). (*See* Dkt. No. 17 at 6 n.5.)

Rubenstein responds that the investment-advisor exception does not apply if the shares were acquired with "the purpose or effect of changing or influencing control of the issuer." 17 C.F.R. § 240.16a–1(a)(1). Rubenstein then points to the Complaint, which alleges that Defendants' 13D filing said:

> [Berkowitz and Fairholme] reserve the right to be in contact with members of [Sears'] management [and] Board of Directors, other significant shareholders and others regarding alternatives that [Sears] could employ to increase shareholder value. The contact may include proposing or considering any of the actions enumerated in Item 4 of the instructions to Schedule 13D.

(Compl. ¶ 13.) The Complaint further alleges that "any of the actions enumerated in Item 4 of the instructions to Schedule 13D" means "actions having a 'change of control' purpose or effect with respect to [Sears]." (*Id.*) And because Defendants contemplated effecting changes within Sears, Rubenstein argues, Defendants do not qualify for the investment-adviser exception. (*See* Dkt. No. 21 at 6–8.)

Either way, at this stage, the Court need not decide whether the investment-adviser exception in fact applies: the applicability of that exception is a factual issue that is not properly

5

resolved on a motion to dismiss. *See Packer on Behalf of 1-800-flowers.com, Inc. v. Raging Capital Mgmt.*, LLC, 242 F. Supp. 3d 141, 149 (E.D.N.Y. 2017). This is especially so given that Defendants have not briefed this issue besides noting their factual objection. For the purposes of this motion, therefore, the Court accepts the allegation in the Complaint that Defendants and their managed-account clients were beneficial owners of over ten percent of Sears stock. As such, they were subject to the short-swing profit rule.

    C.    **Beneficial Ownership for Purposes of Section 16 Liability**

Once Defendants and their clients are deemed insiders, the next question is whether Defendants were beneficial owners of the securities involved in the subsequent short-swing transactions.

As noted above, this question involves a different definition of "beneficial ownership." Once a person is deemed a corporate insider, Rule 16a–1(a)(2) defines "beneficial owner" as "any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the equity securities" that yielded the short-swing profits. 17 C.F.R. § 240.16a–1(a)(2). The term "pecuniary interest" is defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a–1(a)(2)(i).

There is an important distinction to be made here: Even if Berkowitz, Fairholme, and their managed-account clients are deemed, by virtue of their group ownership, to hold ten percent of Sears stock, they are not automatically liable just because one member of that group subsequently makes a short-swing profit. As the SEC put it, "if the group member does not have or share a pecuniary interest in securities held by other group members, the transactions of the other group members do not create section 16 obligations for that member." Securities Exchange Act Rel. No. 34–28869, 56 Fed. Reg. 7242, 7245 (Feb. 21, 1991); *see also Strauss ex*

6

*rel. Servico, Inc. v. Am. Holdings, Inc.*, 902 F. Supp. 475, 481 (S.D.N.Y. 1995). Thus, the question is whether Berkowitz and Fairholme *themselves* had any pecuniary interest in the alleged short-swing transactions.

Defendants correctly point out that the Complaint's allegations on this front are meager. The factual allegations as to Defendants' pecuniary interest in the short-swing trades amount to the following three paragraphs:

> Between September 18, 2014, and on an ongoing basis through the date of this Complaint, Defendants, including through various "managed accounts" advised or managed by one or both of them, engaged in purchases and sales of Sears common stock or other Sears securities, during periods of less than six months, which resulted in their realization of profits under Section 16(b).
>
> Defendants . . . purchased and sold or sold and purchased equity securities or equity security equivalents of [Sears] within periods of less than six months of each other while insiders of [Sears] . . . .
>
> By reason of such purchases and sales or sales and purchases of its equity securities or equity security equivalents within periods of less than six months of one another while insiders of [Sears], Defendants realized profits, the exact amounts thereof being unknown to Plaintiff, which profits inure to the benefit, and are recoverable by plaintiff on behalf of [Sears].

(Compl. ¶¶ 20, 28–29.)

To make things worse, Rubenstein tries to bandage this shortcoming by claiming that the case law uniformly holds that "a plaintiff is not required to allege that insider defendants have a 'pecuniary interest' in transactions they admittedly executed in accounts within their collective investment discretion," and that there is a presumption of pecuniary interest that shifts the burden onto the defendant. (Dkt. No. 21 at 9.) However, the Court is unaware of any such presumption, and, somewhat troublingly, none of the cases cited by Rubenstein supports this proposition even remotely. *See Bull & Bear U.S. Gov't Sec. Fund, Inc. v. Karpus Mgmt. Inc.*, No. 98 Civ. 1190, 1998 WL 388546, at *2 (S.D.N.Y. July 13, 1998); *Strauss*, 902 F. Supp. at 481–82. Indeed, the

7

Second Circuit, in a case discussed in great depth by both parties, explicitly rejected an argument that there is a presumption of pecuniary benefit. *Roth v. Jennings*, 489 F.3d 499, 516–17 (2d Cir. 2007). As the court of appeals noted:

> [W]hat is required for the imposition of strict liability on [defendant] is that [defendant] itself have realized profits from short-swing transactions. No such "presumption" [of pecuniary interest] arises from [the conduct alleged in the complaint] and no such allegation appears in the complaint. The complaint's assertion that "each member of the Group is liable to the extent of its pecuniary interest in the foregoing disgorgeable profits" does not constitute an allegation that [defendant] in fact realized any such profits.

*Id.* (some alterations and citations omitted).

In this respect, this case is materially indistinguishable from *Roth*. Without the benefit of any "presumption," the Complaint does not plausibly allege pecuniary benefit to Defendants in their personal capacities.[1] Indeed, the Complaint does not contain much beyond conclusory allegations restating the elements of Section 16 liability.[2] Granted, the Complaint *might* plausibly allege pecuniary benefit by the managed-account clients—and that is discussed next. But the Complaint does not adequately allege pecuniary benefit to Berkowitz and Fairholme *qua* Berkowitz and Fairholme. *See Mercer v. Gupta*, 712 F.3d 756, 759 (2d Cir. 2013) ("Section 16(b) requires that the defendant *himself* 'realized *profits* from short-swing transactions.'") (quoting *Roth* 489 F.3d at 517) (first emphasis added); *see also* 17 C.F.R. § 2410.16a–

---

[1] The term "personal capacity" has no legal significance here; it is used only to distinguish between claims that Defendants themselves made short-swing profits and claims that Defendants are responsible for their clients' short-swing profits.

[2] Defendants also argue that they were paid solely asset-based fees, rather than incentive-based fees, and therefore had nothing to gain from any profits made by their managed-account clients. *See* 17 C.F.R. § 240.16a-1(a)(2)(ii)(C). But given the posture of this case, the Court does not rely on this extrinsic evidence, and instead looks only to the allegations in the Complaint. The same goes for the parties' references to various Section 13 or Section 16 filings, none of which are in the Complaint or before the Court on this motion.

8

1(a)(2)(ii)(C) (stating that a performance-related fee is a pecuniary interest but "a right to a nonperformance-related fee alone" is not).

Accordingly, the Complaint fails to state a claim against Berkowitz and Fairholme in their personal capacities.

### D.    Defendants' Managed-Account Clients

Rubenstein next argues that even if Defendants themselves made no disgorgeable short-swing profits, they should be obligated to disgorge any short-swing profits made by their managed-account clients. Rubenstein's argument appears to be based on an agency theory. However, Rubenstein cites no relevant authority for this expansive interpretation of Section 16, which would require an agent to disgorge its principals' profit even if the agent had no pecuniary gain.[3] Since the Complaint fails to plausibly allege that Defendants *themselves* derived any pecuniary benefit from their clients' trades, it fails to state a claim against Defendants for disgorgement of their clients' alleged short-swing profits. *See Roth*, 489 F.3d at 517 (rejecting argument that plaintiff, who had not plausibly alleged a pecuniary interest, should be allowed to proceed to discovery in order to uncover whether there was pecuniary interest).

### E.    Leave to Amend

Rubenstein asks for leave to amend the Complaint in the event it is found lacking. Specifically, he seeks to add the managed-account clients as defendants. That request is granted, but the Court reiterates that any amended Complaint must plausibly allege, in sufficient detail, that there were short-swing trades, and that each defendant had a pecuniary interest in those

---

[3] The sole case cited by Rubenstein is inapposite, as it deals with the first definition of "beneficial owner"—in subsection (a)(1)—whereas the issue here is the second definition of "beneficial owner," which is in subsection (a)(2). *See Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 221–22 (2d Cir. 2012).

short-swing trades. *See Roth*, 489 F.3d at 517 (noting that any amended pleading would have to comply with the Rule 11 requirement that a complaint's factual assertions "have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery") (quoting Fed. R. Civ. P. 11(b)(3)).

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Rubenstein may file an amended complaint on or before January 12, 2018.

The Clerk of Court is directed to close the motion at Docket Number 16.

SO ORDERED.

Dated: December 11, 2017
    New York, New York

_____
J. PAUL OETKEN
United States District Judge